# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

SHAWNA M. FLECK,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

Defendant.

No. C12-1029

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

*I.*   *INTRODUCTION* ........................................ 2

*II.*  *PRIOR PROCEEDINGS* ................................... 2

*III.* *PRINCIPLES OF REVIEW* ............................... 4

*IV.* *FACTS* ................................................. 6
     *A.*   *Education and Employment Background* .................. 6
     *B.*   *Administrative Hearing Held on August 23, 2007* ............. 6
          *1.*   *Fleck's Testimony* ................................ 6
          *2.*   *Vocational Expert's Testimony* ..................... 7
     *C.*   *Administrative Hearing Held on September 9, 2010* ........... 7
          *1.*   *Fleck's Testimony* ................................ 7
          *2.*   *Vocational Expert's Testimony* ..................... 9
     *D.*   *Fleck's Medical History* ............................... 9
     *E.*   *Non-Medical Vocational Evidence* ..................... 14

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

V.    CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      A.    ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . . 15
      B.    Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . . . 18
            1.    Dr. Davis' and Dr. Frommelt's Opinions . . . . . . . . . . . . 18
            2.    The Goodwill Reports . . . . . . . . . . . . . . . . . . . . . . 24
      C.    Reversal or Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII.  ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Shawna M. Fleck on October 11, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title XVI supplemental security income ("SSI") benefits. Fleck asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits. In the alternative, Fleck requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

On July 8, 2005, Fleck applied for SSI benefits. In her application, Fleck alleged that she became disabled on May 6, 1987[2] due to a non-verbal learning disability, neuro-muscular disability, obsessive compulsive disorder ("OCD"), and depression.[3] Fleck's

---

[2] In her application, Fleck listed her birth date as her disability onset date. However, SSI benefits are not payable to a claimant until the month following the month in which the application was filed. *See* 20 C.F.R. § 416.335. Thus, Fleck's earliest onset date would be in August 2005, the month following her application for SSI benefits on July 8, 2005.

[3] *See* Administrative Record at 132 (medical conditions listed by Fleck as reasons for limiting her ability to work).

2

application was denied on September 21, 2005. On February 17, 2006, her application was denied on reconsideration. On May 14, 2006, Fleck requested a hearing before an Administrative Law Judge ("ALJ"). On August 23, 2007, Fleck appeared via video conference with her attorney before ALJ John E. Sandbothe for an administrative hearing. Fleck and vocational expert Julie A. Svec testified at the hearing. In a decision dated February 5, 2008, the ALJ denied Fleck's claim. The ALJ determined that Fleck was not disabled and not entitled to SSI benefits because she was capable of performing her past relevant work as a sales associate. Fleck appealed the ALJ's decision. On May 20, 2010, the Appeals Council remanded the case back to the ALJ for resolution of multiple issues, including consideration of Fleck's mental impairments, work history, subjective testimony, and non-medical evidence.[4]

On September 9, 2010, Fleck appeared via video conference with her attorney before ALJ Sandbothe for a second administrative hearing on remand. Fleck and vocational expert Marion S. Jacobs testified at the hearing. In a decision dated October 6, 2010, the ALJ again denied Fleck's claim. Specifically, the ALJ determined that Fleck was not disabled and not entitled to SSI benefits because she was functionally capable of performing other work that exists in significant numbers in the national economy. Fleck appealed the ALJ's second decision. On August 28, 2012, the Appeals Council denied Fleck's request for review. Consequently, the ALJ's October 6, 2010 decision was adopted as the Commissioner's final decision.

On October 11, 2012, Fleck filed this action for judicial review. The Commissioner filed an answer on December 14, 2012. On January 16, 2013, Fleck filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On March 15, 2013, the Commissioner filed

---

[4] *See* Administrative Record at 88-90.

a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On November 14, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's

decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Education and Employment Background

Fleck was born in 1987. She is a high school graduate. While in grade school and secondary school, she took special education classes in math, social studies, and English. At the administrative hearing, Fleck stated that she worked at a department store, and sometimes had difficulty making change, unless it was calculated for her on the cash register.

The record contains a detailed earnings report for Fleck. The report covers the time period of 2004 to 2010. From 2004 to 2009, Fleck earned between $695.50 (2004) and $10,584.20 (2006). Through the first quarter of 2010, Fleck earned $2,005.00.

### B. Administrative Hearing Held on August 23, 2007

#### 1. Fleck's Testimony

At the administrative hearing, Fleck's attorney inquired about Fleck's employment. Fleck explained that she works part-time at a department store. Specifically, she stated that she works about 30 hours per week. She reported that it is difficult for her to work when the store is busy due to stress and issues with OCD. Fleck's attorney asked Fleck to describe her difficulties with OCD. Fleck testified that:

> Like if I'm cleaning my room I collect hats and if I set anything down it can't be upside down. Like a hat or a book. It can't be upside down or backwards; it has to be right-side-up. And if I touch something by accident, if I touch it -- if I bump it twice, I have to touch it again a third time or else something bad will happen to my family. That's just what goes throughout my mind.

(Administrative Record at 545.) Fleck's attorney also inquired why Fleck believed she was incapable of performing full-time work:

> Q: Other than the work you're doing now, what would prevent full-time work?

A:    I tire very easily. I can't stand a lot of stress for a long
      time. I guess common sense level . . . just, you know,
      I don't understand written direction very well. I mean,
      spoken direction.
Q:    Okay. Does it take you a while to learn new jobs?
A:    Yes. It takes me a long while to learn new things.

(Administrative Record at 545.)

### 2.    *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Julie A. Svec with a hypothetical

for an individual who has:

> no physical limitations to speak of; however, no close attention
> to detail, only superficial contact with the public, no more than
> regular pace. Obviously she can have contact with the public
> to the point of being a sales clerk but I would expect her to be
> like an insurance salesman or a teacher or something of that
> nature.

(Administrative Record at 561.) The vocational expert testified that under such limitations,

Fleck could perform her work as a department store sales clerk. The ALJ provided the

vocational expert with a second hypothetical that was identical to the first hypothetical

except that the individual would need to work at a "slow-pace for up to one-third of the

day, . . . can't tolerate changes in the workplace, and especially she would need not

necessarily constant supervision, but someone to keep track of her."[5] The vocational

expert testified that with such additional limitations, Fleck would be precluded from

competitive employment.

### C.    *Administrative Hearing Held on September 9, 2010*

### 1.    *Fleck's Testimony*

At the second administrative hearing, Fleck testified that she continued to be

employed at a department store, as a sales associate. She stated that she works 20 to 25

---

[5] Administrative Record at 561.

hours per week.  Fleck further stated that on a given workday, she works a total of 4 to 6 hours at a time.

Fleck's attorney asked Fleck to discuss her difficulties with depression and anxiety:

> Q:    Are you having any issues with depression, anxiety, that you can describe?
>
> A:    I have, well I have obsessive compulsive disorder.  I do have depression, anxiety.  My OCD is the biggest thing as far if I put something somewhere, you know, in the wrong place what's going to happen, something bad is going to happen.  And that's my biggest sort of enemy is the OCD.
>
> Q:    How does it affect you, I mean I understand normally OCD is obviously you're obsessed with something but what strikes you as being an issue?
>
> A:    The big thing is if I don't -- if I put a hat down upside down -- when someone has a limb amputated they have what is called phantom pains sometimes and I have what I call phantom barriers where I can feel a barrier pushing against my arm, even though I know it's not there.  And if I put something on or near that barrier, my parents will die, my dog will die or something terrible definitely will happen.
>
> Q:    So then how do you compensate or what's the tradeoff?
>
> A:    Well usually if I -- either I have to carefully put the object in a certain place or I try to challenge the thought where I say only God can control that.  I try to put it on that spot where I can't put it to challenge the thought and then it kind of rebounds, well if you do that then something bad will happen to you personally.
>
> Q:    Does that ever happen when you're trying to work?
>
> A:    It does but at work I can brush it off because at work I know that it's not socially acceptable.  And so at work, work cancels it out where I have to put that object there so that cancels out the curse or whatever you want to call it.

(Administrative Record at 575-76.)

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Marion Jacobs with a hypothetical for an individual with:

> no physical limitations to speak [of,] however simple, routine, repetitive work, superficial contact with the public, [and] regular pace.

(Administrative Record at 587.) The vocational expert testified that under such limitations, Fleck could not perform her past relevant work on a full-time basis, but could perform the following work: (1) stock checker (2,400 positions in Iowa and 209,000 positions in the nation), (2) router (1,400 positions in Iowa and 142,000 positions in the nation), (3) addresser and sorter of packages (240 positions in Iowa and 24,000 positions in the nation), and (4) night stocker (1,500 positions in Iowa and 187,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical which was identical to the first hypothetical, except that the individual would need to work at a "slow pace for one third of the day."[6] The vocational expert testified that with such an additional limitation, Fleck would be precluded from competitive employment.

### D. *Fleck's Medical History*

In January 2004, at age 16, Fleck met with Dr. Thomas Ottavi, Ph.D., at Hillcrest Family Services in Dubuque, Iowa, for a psychological assessment. Fleck reported reoccurring and worsening difficulties with obsessions and compulsions, insecurities in the school setting, growing frustrations, and sadness related to problems with functioning in school and at home. Fleck's parents reported concerns of a return of unstable thinking and unwanted thoughts for Fleck. Dr. Ottavi noted that Fleck began taking special education classes in the 2nd grade, and was diagnosed with a non-verbal learning disability by

---

[6] Administrative Record at 588.

doctors at the University of Iowa Hospitals and Clinics. Upon examination, Dr. Ottavi opined that:

> Fleck has a number of needs in the mental health area[, including] some further assessment and ongoing monitoring of intrusive thoughts, and anxiety and depression interference. She has difficulty maintaining her sense of security and trust as well as confidence that she can handle situations. She needs to consider some options for her education and social involvement and possibly setting some limits as to not get over extended or overwhelmed which leads to much less stable functioning. She does have a history of some violent thinking processes which will need close monitoring.

(Administrative Record at 347.) Dr. Ottavi recommended individual therapy as treatment.

On August 23, 2005, at age 18, Fleck underwent intelligence testing administered by Gerald Odefey, M.S. Fleck took the Wechsler Adult Intelligence Scale, 3rd edition. Odefey noted that Fleck had a history of diagnoses including anxiety disorder, depressive disorder, specific learning disorder, and obsessive-compulsive traits. On testing, Fleck achieved the following scores: (1) 91 verbal IQ, (2) 83 performance IQ, and (3) 87 full scale IQ. Odefey indicated that Fleck's scores reflected a functioning level in the average to low average intelligence ranges. Odefey concluded that:

> [Fleck] is functioning in an overall intellectual fashion that is below age expected levels. The degree of difficulty is relatively minor for the verbal scales and is fairly significant for the performance tasks that are assessed by this particular instrument. These results are certainly compatible with her history of fairly pronounced learning difficulties and in combination with her OCD, depressive and anxiety problems, lead to some fairly pronounced difficulties in various social and occupational settings for her.

(Administrative Record at 353.)

On February 11, 2006, Dr. Herbert L. Notch, Ph.D., reviewed Fleck's medical records and provided Disability Determination Services ("DDS") with a mental residual

functional capacity ("RFC") assessment for Fleck. Dr. Notch diagnosed Fleck with major depression and OCD. Dr. Notch determined that Fleck was moderately limited in the ability to: carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.

On August 16, 2006, Fleck was referred by the Department of Human Services to Dr. Julianne Davis, Psy.D., for a psychological evaluation. Fleck reported that school was "very difficult" for her due to a learning disorder and anti-social personality. Dr. Davis noted that Fleck was in special education throughout her academic career. Dr. Davis further noted that:

> Following her graduation from high school this past spring, [Fleck] took a position at Younkers, a local department store. [She] reports that she works up to 30 hours a week. She works doing stocking and cash register work. [She] indicated that it was somewhat difficult for her to learn to operate the cash register. She continues to struggle with reconciling the cash amount in the register at the end of each shift. [Fleck] indicates that she was able to master doing various transactions with the register, but she felt that it took her more time than it would take most individuals to learn these tasks.

(Administrative Record at 378.) Dr. Davis administered the Minnesota Multiphasic Personality Inventory test to Fleck. Dr. Davis opined that:

> Individuals with personality patterns similar to [Fleck's] often show chronic psychological maladjustment. Individuals with this profile typically are feeling overwhelmed by Anxiety, tension, and Depression. [Fleck] may feel helpless, alone, inadequate, insecure, and have little faith that life will

> improve. [She] likely tends to focus at very low level of
> efficiency. She probably has difficulty with concentration and
> decision making. [She] may tend to blame herself for
> problems. Her life is likely to be chaotic and disorganized,
> and she may have a history of low achievement in work and
> academics. . . . Other individuals with this profile type seem
> to lack basic social skills and are often withdrawn. . . . This
> profile tends to be fairly stable, and individuals with this
> profile type typically have a disorganized and unhappy life
> course.

(Administrative Record at 379.) Dr. Davis diagnosed Fleck with major depressive

disorder and obsessive compulsive disorder. Dr. Davis concluded that Fleck "meets the

criteria for a person with atypical chronic mental illness. [She] has had episodes of loss

of reality contact and shows impairment with her ability to navigate in the community

independently."[7] Dr. Davis recommended that Fleck receive help from a provider of

services to individuals with chronic mental illness. Lastly, Dr. Davis opined that:

> The referral asks a question about whether or not [Fleck] is a
> good candidate for competitive employment. [Her] current job
> at Younkers has been beneficial in providing structure for her
> in the last two to three months. She is currently able to work
> 30 hours a week at what is essentially a minimum wage job.
> Although this position appears to be a good fit for [Fleck], I
> would not see her as flexible enough or as a quick enough
> learner to quickly replace this position should she be laid off
> for reason related to either her performance or to the store's
> need for employees. [Fleck] has difficulty with learning,
> difficulty with communication, and an inability to manage
> stress or unexpected change. These problems support her need
> for Social Security Disability. [Fleck] would be very good
> candidate for a return-to-work program under Social Security,
> so that she would have Social Security as a safety net should
> her employment not last.

(Administrative Record at 380.)

---

[7] Administrative Record at 379.

On October 23, 2007, Fleck was referred by DDS to Dr. Harlan J. Stientjes, Ph.D., for a psychological examination. Dr. Stientjes noted that Fleck was diagnosed with non-verbal learning disorders early on in her schooling. Dr. Stientjes also noted that since graduating from high school, Fleck has been working as a sales associate at a department store. Fleck works approximately 25 hours per week at that job. Upon examination, Dr. Stientjes diagnosed Fleck with obsessive-compulsive disorder, depressive disorder, and learning disorders. Dr. Stientjes opined that:

> [Fleck] can understand and remember simple oral and written instructions. Likewise, she can master simple routines, but certainly is not refined in visual spatial tasks. She can carry out typical instructions from one day to the next, maintaining attention. She has been in good standing in her sales position for over two years. Interactions with others generally appear to be appropriate although she is quite reticent. Safety judgment is intact; social judgment is acceptable, with a high degree of dependency. Response to workplace changes likely will require some degree of supportive supervision.

(Administrative Record at 447.) Dr. Stientjes concluded that:

> [Fleck] is a 20-year-old single female who has a long history of learning disorders identified in the school along with mild mental health problems. There is a high degree of dependency engendered by her mother which [she] appears incapable of breaking at this time. . . . She has been able to maintain partial employment for the past several years. Since she currently works part-time, she likely is considered under-employed. She would like to go back to school with ambitions of being a writer.

(Administrative Record at 447.)

On October 21, 2008, Fleck met with Dr. Stephen F. Frommelt, Ph.D., for an assessment of her cognitive status. Dr. Frommelt noted that Fleck was diagnosed with non-verbal learning disabilities in grade school. Dr. Frommelt opined that Fleck "has not yet been able to achieve independent living despite years of social and academic services,

and despite [her] strong desire to achieve independence. This would certainly appear to be directly attributable to her Nonverbal Learning Disorder and the deficits therein, which are judged to be severe."[8] Dr. Frommelt further opined that:

> To put it simply, verbal skills are overdeveloped in Nonverbal Learning Disorder, and [Fleck] certainly has the verbal skills to present herself well and discuss how to execute certain tasks. Her verbal memory is also excellent. However, her executive and visual motor skills are so impaired that organizing, initiating and executing even relatively simple tasks becomes highly problematic. As a result, she struggles with simple household tasks and activities of daily living. Rudimentary multitasking is almost impossible for her. In addition, because her nonverbal memory is severely impaired, learning even simple novel tasks requires an inordinate amount of time and repetition.

(Administrative Record at 500.) Dr. Frommelt concluded from testing and examination that Fleck should be "considered disabled and should apply for SSI benefits."[9]

### E. Non-Medical Vocational Evidence

In a letter dated April 14, 2006, Goodwill Industries of Northeast Iowa reported that Goodwill helped Fleck find employment as a sales associate at Younkers in September 2005. Once employed Fleck "needed constant job coaching for three weeks to be able to learn the job."[10] The letter further provides that:

> [Fleck] needs assistance to multi-task, complete assigned tasks, and remember all the functions of the cash register. [Fleck] will get flustered when something goes wrong and need assistance to be able to re-focus on her job. [Fleck's] strengths are her ability to get along with others and willingness to do what is asked of her.

---

[8] Administrative Record at 500.

[9] *Id.*

[10] *Id.* at 247.

(Administrative Record at 247.) The letter concluded that "[i]t is our opinion that [Fleck] will not be able to hold a full-time job due to her disability and needs in her everyday life."[11]

In a second letter dated July 13, 2006, Mike Wagner, Associate Program Manager for Goodwill Industries Northeast, stated that Fleck mainly needed assistance with her ability to handle stressful situations. Wagner indicated that Fleck "would become flustered and frustrated if she had too many customers or if something would happen with the cash register."[12] Wagner opined that "I believe an eight hour day would be difficult for [Fleck] due to her inability to focus for that amount of time."[13]

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Fleck is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

---

[11] Administrative Record at 247.

[12] *Id.* at 276.

[13] *Id.*

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his

or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Fleck had not engaged in substantial gainful activity since June 29, 2005, except for the year 2006.[14] At the second step, the ALJ concluded from the medical evidence that Fleck had the following severe impairments: a non-verbal learning disorder, obsessive-compulsive disorder, anxiety, depression, and attention deficit hyperactivity disorder, inattentive type. At the third step, the ALJ found that Fleck did not have an impairment or combination of

---

[14] In his decision, the ALJ explained that Fleck's "earnings for 2006 are $264.20 above the amount used to show an individual has engaged in substantial gainful activity. [Fleck's] earnings for the other years since June 29, 2005 are below the amounts used to show an individual has engaged in substantial gainful activity." Administrative Record at 23.

Fleck takes exception to the ALJ's finding on this issue. First, while admitting that the ALJ correctly determined that her earnings in 2006 were over the amount used to show that an individual engaged in substantial gainful activity, Fleck asserts that her earnings were "not much above that amount." Fleck's Brief (docket number 9) at 18. The Court is unpersuaded by this argument. Whether the earnings were slightly above or greatly above the amount necessary for finding that an individual's earnings constitute substantial gainful activity, the fact is Fleck's earnings constituted substantial gainful earnings in 2006. Fleck offers no authority to the contrary. Second, Fleck argues that her earnings in 2006 should not be considered substantial gainful activity because she worked under "special conditions." *See* 20 C.F.R. § 416.973(c) (providing that determination of substantial gainful activity requires consideration of special conditions). While Fleck outlines medical evidence which suggests some difficulties she has or may have from working, she presents no specific "special conditions" which would suggest her 2006 earnings should not be considered substantial gainful activity. Accordingly, the Court finds that Fleck's arguments with regard to earnings in 2006 have no merit. The Court concludes that the ALJ did not err at step one of the five-step sequential test. The Court will not further address this issue.

impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Fleck's RFC as follows:

> [Fleck] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: able to do only simple, routine, repetitive work; can have only superficial contact with the public; and can work at no more than a regular pace.

(Administrative Record at 26.) Also at the fourth step, the ALJ determined that Fleck had no past relevant work.[15] At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Fleck could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Fleck was not disabled.

### B. Objections Raised By Claimant

Fleck argues that the ALJ erred in three respects. First, Fleck argues that the ALJ failed to properly evaluate the opinions of Dr. Davis. Second, Fleck argues that the ALJ failed to properly evaluate the opinions of Dr. Frommelt. Lastly, Fleck argues that the ALJ failed to properly consider the reports from Goodwill Industries.

### 1. Dr. Davis' and Dr. Frommelt's Opinions

Fleck argues that the ALJ failed to properly evaluate the opinions of consultative examiners, Dr. Davis and Dr. Frommelt. Specifically, Fleck argues that the ALJ failed to weigh Dr. Davis' opinions, or give any reasons for accepting or rejecting Dr. Davis' opinions. With regard to Dr. Frommelt's opinions, Fleck asserts that the ALJ's reasons for discounting Dr. Frommelt's opinions are not supported by substantial evidence on the record. Fleck also argues that the ALJ erred by failing to take Dr. Davis' and Dr. Frommelt's opinions into consideration when making his RFC determination. Fleck

---

[15] The ALJ's decision provides no explanation for this finding. *See* Administrative Record at 30.

concludes that this matter should be remanded for further consideration of the opinions of Dr. Davis and Dr. Frommelt, and how their opinions relate to her RFC.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 416.927(c). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Furthermore, when an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697(citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

In considering a physician's RFC assessment, an ALJ is not required to give controlling weight to the physician's assessment if it is inconsistent with other substantial evidence in the record. *Strongson*, 361 F.3d at 1070; *see also Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling, 96-8p (July 2, 1996).

In his decision, the ALJ addressed Dr. Davis' opinions. While the ALJ reviewed various findings of Dr. Davis, the ALJ failed to address Dr. Davis' opinions regarding Fleck's functional abilities or limitations.[16] Specifically, the ALJ offers no discussion of Dr. Davis' determination that Fleck's limitations stemming from anxiety and depression, include: (1) a low level of efficiency due to difficulties with focus; (2) difficulties with concentration and decision making; and (3) difficulties with disorganization in daily life.[17] Moreover, the ALJ failed to address Dr. Davis' opinions on Fleck's ability to sustain full-time employment, a question Dr. Davis was asked to address in her evaluation of Fleck. In addressing the issue of Fleck's ability to sustain full-time employment, Dr. Davis opined that:

> The referral asks a question about whether or not [Fleck] is a good candidate for competitive employment. [Her] current job at Younkers has been beneficial in providing structure for her in the last two to three months. She is currently able to work

---

[16] *Compare* Administrative Record at 27-28 (ALJ's decision) with 378-80 (Dr. Davis' Psychological Evaluation).

[17] *See* Administrative Record at 379.

20

> 30 hours a week at what is essentially a minimum wage job.
> Although this position appears to be a good fit for [Fleck], I
> would not see her as flexible enough or as a quick enough
> learner to quickly replace this position should she be laid off
> for reason related to either her performance or to the store's
> need for employees. [Fleck] has difficulty with learning,
> difficulty with communication, and an inability to manage
> stress or unexpected change. These problems support her need
> for Social Security Disability. [Fleck] would be very good
> candidate for a return-to-work program under Social Security,
> so that she would have Social Security as a safety net should
> her employment not last.

(Administrative Record at 380.) The Court believes that failing to address these opinions

draws into question the ALJ's RFC assessment and whether the ALJ's RFC is supported

by substantial evidence. *See Guilliams*, 393 F.3d at 803. Significantly, the ALJ offered

no reasons for accepting or rejecting Dr. Davis' opinions. Therefore, the ALJ failed in

his duty to address, let alone resolve any conflicts among treating and examining

physicians. *See Wagner*, 499 F.3d at 848; *see also* Social Security Ruling, 96-8p (July 2,

1996) ("If the RFC assessment conflicts with an opinion from a medical source, the

adjudicator must explain why the opinion was not adopted."). Accordingly, the Court

finds that this matter should be remanded for further consideration of Dr. Davis' opinions,

including consideration of how Dr. Davis' opinions relate to Fleck's RFC determination.

Turning to Dr. Frommelt's opinions, the ALJ addressed his opinions as follows:

> Dr. Frommelt noted that executive functions are necessary for
> appropriate adult level conduct and include such skills as
> initiation, planning, organization, decision making, flexibility,
> adapting to novel situations, and multitasking. He felt her
> nonverbal learning disorder and resulting deficits were severe.
> He stated her executive and visual motor skills were so
> impaired that organizing, initiating, and executing even
> relatively simple tasks became highly problematic, and that as
> a result, [Fleck] struggled with simple household tasks and
> activities of daily living, that rudimentary multitasking was

almost impossible, and that learning even simple novel tasks required an inordinate amount of time and repetition. The undersigned gives little weight to the opinion of Dr. Frommelt, because it is inconsistent with [Fleck's] satisfactory performance of semiskilled work for several years, the assessment of Dr. Steintjes [*sic*] discussed above, and the progress reported by occupational, physical, and speech therapists discussed below.

(Administrative Record at 28-29.) Here, the ALJ both clearly addressed and offered reasons for rejecting Dr. Frommelt's opinions.

Fleck argues, however, that the ALJ's reasons for rejecting Dr. Frommelt's opinions are insufficient and not based on substantial evidence in the record. First, Fleck points out that Dr. Frommelt's opinions are consistent with the opinions of Dr. Davis. In treating Fleck, Dr. Frommelt met with Fleck on four separate occasions and administered multiple tests to evaluate Fleck's cognitive abilities. Based on testing, Dr. Frommelt opined that Fleck's "current test results support the conclusions of earlier clinicians, including Dr. Davis . . . that [Fleck] is considered disabled and should apply for SSI benefits."[18] Dr. Frommelt and Dr. Davis also agree that Fleck has difficulty with focus, concentration, decision making, and disorganization. Second, Fleck calls into question the ALJ's reliance on the opinions of Dr. Stientjes for purposes of rejecting Dr. Frommelt's opinions. Specifically, Fleck points out that: (1) Dr. Frommelt had multiple meetings with her compared to Dr. Stientjes' single meeting with her; (2) Dr. Frommelt administered 10 cognitive tests compared to four tests administered by Dr. Stientjes; and (3) Dr. Frommelt's evaluation was more comprehensive and more recent than Dr. Stientjes' evaluation. Moreover, Dr. Frommelt specifically addressed Dr. Stientjes' opinions and stated:

_____

[18] Administrative Record at 500.

22

The test results do not support the conclusions of Dr. Stientjes (2007) who stated that [Fleck] should have no trouble handling her own finances. Current testing found her mathematical abilities at the 4th grade level and below the 1st percentile. In addition, he noted an emotional 'dependency' upon her mother. To the contrary, [Fleck's] marked cognitive impairments necessitate significant aid and support from another adult, and so her physical dependency is very real.

(Administrative Record at 500.) Finally, the ALJ's reliance on occupational, physical, and speech therapy reports to distinguish Dr. Frommelt's opinions is insufficient because the ALJ simply offers conclusory remarks that Fleck was progressing in 2006, two years prior to Dr. Frommelt's opinions.

Here, even though the ALJ addressed Dr. Frommelt's opinions in his decision, and provided reasons for discounting Dr. Frommelt's opinions, the Court believes that the ALJ failed to fully and fairly develop the record with regard to Dr. Frommelt's opinions. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (providing that an ALJ has a duty to develop the record fully and fairly). Specifically, the ALJ failed to consider and/or address: (1) the examining relationship between Fleck and Dr. Frommelt (they met on four separate occasions); (2) the fact that Dr. Frommelt was the most recent physician to evaluate Fleck; (3) the extensive testing administered by Dr. Frommelt; (4) Dr. Frommelt's disagreement with Dr. Stientjes' opinions; (5) the consistency between Dr. Frommelt's opinions and Dr. Davis' opinions; and (6) Dr. Frommelt and other medical and non-medical sources agreed that Fleck would have difficulty performing full-time work. *See Wiese*, 552 F.3d at 731 (discussing the factors to consider when addressing an examining physician). Under the circumstances, the ALJ's failure to address these pertinent issues leads the Court to conclude that the ALJ failed to adequately resolve any conflicts that might exist among treating and examining physicians. *See Wagner*, 499 F.3d at 848; *see also* Social Security Ruling, 96-8p (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the

opinion was not adopted."). Accordingly, the Court finds that this matter should be remanded for further consideration of Dr. Frommelt's opinions, including consideration of how Dr. Frommelt's opinions relate to Fleck's RFC determination.

## 2. *The Goodwill Reports*

The opinions contained in letters from Goodwill Industries do not provide opinions from individuals classified as "acceptable medical sources" under the Social Security Regulations. Even though these opinions are not an "acceptable medical source," the Social Security Administration ("SSA") requires an ALJ to consider such opinions in making a final disability determination. On August 9, 2006, the SSA issued Social Security Ruling 06-03p. The purpose of Ruling 06-03p was to clarify how the SSA considers opinions from sources not classified as "acceptable medical sources." *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Ruling 06-03p provides that when considering the opinion of a source that is classified as a "not acceptable medical source," such as a social worker, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. Furthermore, in discussing SSR 06-03p, the Eighth Circuit Court of Appeals, in *Sloan*, pointed out:

> Information from these 'other sources' cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Sloan*, 499 F.3d at 888 (quoting SSR 06-03p). In determining the weight afforded to "other source" evidence an "ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (citation omitted).

> The ALJ addressed the opinions of individuals from Goodwill Industries as follows:

> Goodwill industries assisted [Fleck] in securing her current job as a sales associate. Goodwill provided job coaching for the first three months [Fleck] worked as a sales associate. The main area [she] needed assistance with was her ability to handle stressful situations including having multiple customers or having problems with the cash register. An associate program manager in a letter dated July 13, 2006 to [Fleck's] attorney stated that [Fleck's] demeanor toward customers was always very good, she got along with coworkers, and she was respectful to her supervisor. Her work supervisor reported the only accommodation provided was they tried to have [Fleck] work with another associate whenever possible. The Goodwill associate program manager felt it would be difficult for [Fleck] to work an eight hour day because of her problems focusing for that amount of time. Again, the undersigned notes, [Fleck] is performing a semiskilled job, and it appears the associate program manager was giving an opinion on her ability to perform that semiskilled occupation on a full-time basis and not an opinion on her ability to perform unskilled occupations.

(Administrative Record at 29.)

Having reviewed the entire record, the Court finds that the ALJ properly considered the evidence from Goodwill Industries in accordance with SSR 06-03p. Great deference is given to an ALJ's evaluation of "other source" evidence, and the Court concludes that the ALJ adequately addressed the evidence from Goodwill Industries. *See Raney*, 396 F.3d at 1010. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to fully and fairly develop the record with regard to the opinions of Dr. Davis and Dr. Frommelt. Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall fully and fairly develop the record with regard to opinions Dr. Davis and Dr. Frommelt. The ALJ must also provide clear reasons for accepting or rejecting Dr. Davis' and Dr. Frommelt's opinions, and support his reasons with evidence from the record. Additionally, the ALJ should address how the opinions of Dr. Davis and Dr. Frommelt relate to Fleck's RFC assessment.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this ___3rd___ day of July, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA